THE YOUNG AMERICA, Her Tackle, etc.

*(District Court, D. New Jersey.  July 2, 1884.)*

1. SALVAGE—VESSEL IN PERIL—TUG—TOWAGE.
    A vessel whose captain and crew, apprehending danger from a fire raging in the immediate neighborhood, exhibit a signal for a tug, is afterwards liable to the tug which responds for *salvage* and not for *towage* service.

2. SAME—ESTIMATION OF SERVICE.
    The value of a service performed is not to be estimated by the light of subsequent events, but of the facts which seemed to surround it at the time.

3. SAME—PANIC—EXORBITANT DEMAND.
    The court, in awarding the salvage, may take into consideration the unworthy conduct of the captain of the tug, who apparently sought to profit by the fright of the crew of the vessel, and reduce the amount from the exorbitant claim.

Libel for Salvage.

*Jas. K. Hill, Wing & Shoudy*, for libelants.

*Beebe & Wilcox*, for claimants.

NIXON, J.  This is a libel *in rem* by the owner, master, and crew of the steam-tug Henry L. Waite to recover salvage for services rendered to the ship Young America under the following circumstances: At about a quarter before 2 o'clock on the afternoon of February 8, 1884, an oil tank exploded and a fire broke out in the yard of the Standard Oil Company, at Hunter's point, on the East river.  The place of the explosion which caused the fire was upwards of 200 feet back from the river front, and about 50 feet south of the canal or creek which is the northern boundary of the yard, and that separates it from the Daylight or Empire oil-yard.  This canal is about 125 feet in width.  The Daylight oil-yard borders upon it on the south, and upon the East river on the west.  When the fire began, the claimants' vessel, Young America, was lying on the river bulk-head of said yards, outside of the bark William K. Chapman, about 200 feet north of the creek, and fastened to the shore by lines.  These lines were shortly afterwards cut,—by whom i' does not appear,—and both vessels began to drift slowly towards the middle of th. stream and down the river.  It was about low water, and there is proof that there was a slight eddy, which carried them towards the mouth of the creek, and an east wind that blew them a short distance from the shore.  She had a signal displayed on the port side, in her rigging, asking for a tow.  The libelants' boat was docking a vessel at the foot of Fourteenth street, on the New York side of the river, when the explosion and the consequent smoke and fire in the Standard oil-yard attracted their attention.  They hastened over to the other side in order to be in a position to render aid to vessels requiring help, and, being attracted by the signal on the Young America, they went alongside, fastened to her, and towed her up the river opposite to Blackwell's island, and left her there at anchor.  The spars of the William K. Chapman were so entangled in the rigging of the Young America

that she also was towed to about the middle of the river, when she became disengaged and was anchored. When the vessels were taken up by the Waite, they were adrift in the river near the eastern shore, and just above the mouth of the canal or creek which separates the Standard oil-yard from the Daylight or Empire yard, on the southern side of which the fire was raging in a threatening manner. Whether they were in immediate peril or not does not clearly appear, but the testimony shows that the crew of the Young America was badly scared, and that they availed themselves with great alacrity of the offer of the tug-boat to tow them to some place where their safety would be more apparent.

Was the work performed by the Henry L. Waite and her crew, under such circumstances, a salvage or a towage service? It was certainly something more than the latter, although, as affairs turned out, perhaps a low grade of the former. It is often difficult to get a fair estimate of the value of a service by viewing it in the light of subsequent events. It ought to be looked at in connection with the facts which seem to surround it at the time. We can look back now and easily come to the conclusion that the Young America was, at no juncture of the affair, in any real danger. We can see that, after she got beyond the influence of the eddy, the young flood-tide and the easterly wind would co-operate, if she were left alone, to remove her from the impending peril. But then there was great excitement. The oil tanks were exploding, the oil taking fire and running into the creek ablaze, and the flames were extending a hundred feet in the air. The surface of the creek was not covered, nor more than half covered, with the burning oil, and yet, to the excited imagination of a number of the witnesses, the flame extended from shore to shore, and threatened to creep over into the Daylight yard, and to come in contact with other inflammable materials. They never went quite to the mouth of the creek,—certainly not beyond the mouth,—and yet some spectators believed that the water was ablaze nearly a hundred feet into the river. Such was the condition of affairs when the Waite appeared upon the scene. She came, not merely as an angel of mercy, to relieve distress and avert threatened disaster, but with an eye to business and profit as well.

The captain of the steam-tug says that he saw the signal of distress in the rigging of the Young America; that he drew along-side and asked for the captain, and was told that he was forward. He then remarked to a man, whom he afterwards understood was the mate, "You tell the captain that I will take him out for $1,000;" and the reply came back, "Give him a line." The line was given and made fast, and the ship towed to the other side of the river.

The master of the Waite claims that a contract was entered into that he should receive $1,000 for the service of taking charge of the ship and removing her to a place of safety, and asks the court to so decree. The master of the Young America, on the other hand, de-

nies that he made any agreem~ ~; swears that he heard nothing about the charge of $1,000; and avers that he ordered the line to be given because he understood that the Waite had come with the offer of a mere towage service. He has an imperfect knowledge of the English language, and it is not clear from the proofs that he comprehended that $1,000 was to be demanded for the service to be performed. But even if he did, I am not sure that a contract made under such circumstances ought to be enforced by the court. Contracts of this nature, entered into in the midst of excitement, are justly regarded by the courts with suspicion, especially when they are of such an unconscionable character. Neither the Waite nor the Young America was subjected to any peril which authorized the demand for, or the agreement to pay, any such sum for a service without risk and of so short duration.

I have read all the testimony with care, and have come to the conclusion that $300 is a liberal allowance for the service rendered. A decree will therefore be entered for the libelants for that sum, with costs; one-half to be awarded to the owner of the tug-boat, $25 to the master, and the remaining $125 to be divided among the crew, including the master, in proportion to the rate of the wages, respectively, paid to them. If such division cannot be made by the proctors, a reference will be ordered. I should have made a larger allowance to the master of the Waite if I was not strongly impressed with the thought that, in his demand of $1,000 for such a service, he was attempting to profit by the fright and necessities of the claimants.