## THE G. W. JONES.[1]

### NEW YORK & C. MAIL S. S. CO. *v.* THE G. W. JONES.

*(District Court, S. D. New York. January 12, 1892.)*

1. SALVAGE—NECESSITY FOR AID—POWER OF MASTER TO CONTRACT.
   In an emergency the master of a ship is not required to obtain special authority from his owners before entering into a contract to pay an agreed amount for salvage aid.

2. SAME—ENFORCEMENT OF CONTRACT—REASONABLE AMOUNT.
   An admiralty court, however, will look at the reasonableness of the amount agreed on before enforcing a salvage contract.

3. SAME—TOWING VESSEL OFF BEACH—CASE STATED.
   A steam-ship, in getting under way from her wharf at Progresso, broke her anchor, and the wind caused her to strand on the beach. She could not get off by her own efforts, but was in no danger unless a northerly storm should spring up. It being deemed dangerous to allow her to lie there overnight, a written contract was made by her master with libelants' tug, the only one at Progresso, to get her off for $2,500, with $500 additional in case the tug or her hawser should receive any damage. The tug thereafter got the ship off uninjured. On suit brought to enforce the contract, the answer of the ship averred that the contract was signed under duress, and that the master did not communicate with his owners, as he might and should have done. The ship and cargo were worth $107,000; the tug $25,000. The latter was not hurt, but incurred some danger of injury. The time of her service was short. *Held*, that the tug should receive $2,000 for her services.

In Admiralty. Suit to recover salvage award.

*Carter & Ledyard*, for libelants.

*Butler, Stillman & Hubbard*, for claimants.

BROWN, J. In the afternoon of November 1, 1890, as the steam-ship G. W. Jones was getting under way from the outer end and the westerly side of the main wharf at Progresso, the fluke of her anchor, on which she was heaving, broke, and, a strong wind from the north-west catching her upon the starboard bow, she swung off, and stranded broadside upon the beach. Repeated efforts were at once made, by heaving upon the lines leading to the wharf, to pull her off the beach, but without success. Her winches were stranded, and several lines "of the best manilla rope" were broken. The sea was choppy, the wind fresh, and it was near high water. There was no danger of wreck unless a northerly storm should come up, but the master deemed it dangerous to leave the vessel in that condition overnight, lest she should work higher up on the beach and deeper in the sand. After some negotiation, a written contract was made with the master of the libelants' tug M. Moran to haul her off the beach to a safe anchorage place for $2,500, with $500 additional in case the tug should suffer damage to her hull, engines, rigging, or hawser. This agreement was made about 7 P. M. The tug procured hawsers, got at work upon the steamer at about 8 P. M., and at 9 succeeded in getting her afloat, and thereafter took her about three miles out into good anchorage ground, completing the service at about 1 A. M. the

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

same night. The next day being Sunday, the master of the steamer on the day following gave a draft on New York for $2,500, the sum agreed on, which was not accepted or paid, and the above libel was filed to enforce the contract for the salvage service.

The answer admits the service, but avers that the ship was not in a dangerous position; that the so-called agreement "does not constitute a contract, in that the captain of said steam-ship was compelled to sign said paper by duress and compulsion, and in that he had no authority from the owners of said steam-ship and cargo to sign it, and in that he did not communicate with the owners, which he might easily have done." It does not aver that the amount was unreasonable or excessive. The testimony of the master, as well as the libel, shows that he feared that the steamer might be driven up further on the beach during the night, unless she was immediately hauled off. The circumstances show that this apprehension was justifiable. It was his duty, therefore, to procure any aid at hand that could be reasonably procured for the immediate relief of the steamer. His authority as master to secure this at once, without communication with the owners, is plain. The circumstances did not admit of delay, nor is there any rule of the maritime law that would require the master to obtain special authority in order to secure relief of this kind in an emergency. *The A. D. Patchin*, 1 Blatchf. 414.

The evidence does not justify the defense of duress or compulsion. The master was not at sea, but in port, and had the option of procuring any different kind of relief that Progresso afforded. The tug was maintained there for special service, but this circumstance worked no constraint upon the steamer. On the other hand, it is a consideration of some importance in determining what is a reasonable compensation. The steamer and her cargo were of the agreed value of $107,000; the tug, of the value of $25,000. The witnesses for the tug testify that in rendering the service she necessarily encountered some danger, in working her engines to the utmost capacity, of straining both the boat and the machinery, and also of running upon the steamer's anchor. She received no injury, however, and the steamer was got off without suffering any damage whatsoever, and sailed for Boston on the second day after.

I cannot attach much weight to the evidence of the witnesses at Progresso that the steamer was not in peril. Doubtless she was not in immediate peril of being wrecked, but the witnesses do not say that it was not perilous to leave her on the beach in her stranded condition, without attempting immediate relief. As above stated, I agree entirely with the opinion of the master, as expressed at the time, embodied in the contract, and repeated by him in his testimony. Although the answer does not deny the value of the services, yet a court of admiralty would not enforce a contract of this nature, either against the owners or against their property, in a suit *in rem*, any further than it appeared to be reasonable. *The Adirondack*, 2 Fed. Rep. 387; *The Hesper*, 18 Fed. Rep. 692; *The M. B. Stetson*, 1 Low. 119; *The John Ritson*, 35 Fed. Rep. 663; *The Schiedam*, 48 Fed. Rep. 923. Considering that the tug was by the contract to receive $500 additional if she incurred any damage to her

machinery or hawsers in rendering the service, and that this risk was covered by that stipulation, I think that, inasmuch as no such injury was received, and the service was comparatively short, $2,000 will be a sufficiently liberal compensation, and a proper one, in the present case; certainly not more than the courts of England, to which this ship belonged, are accustomed to allow for similar services. See *The Accomac*, Law Rep. [1891,] Prob. 349. As no offer or tender of payment has been made, the decree should be for that sum, with costs.