## THE LASCA.

(District Court, S. D. New York. December 9, 1904.)

1. SALVAGE—VALIDITY OF CONTRACT—EXCESSIVE CHARGE.

A contract to pay a tug $1,000 for the salvage of a yacht worth $20,000, which was stranded on the beach off Coney Island, where she was in danger of "sanding in," which would have caused damage to her, or rendered it more difficult to get her off, *held* not to be excessive, especially in view of damage to the extent of $400 received by the tug in the service.

In Admiralty. Suit to recover for salvage services.

Wilcox & Green, for libellants.
Godkin & Chadbourne, for claimant.

ADAMS, District Judge. This action was brought by Edwin M. Millard and others, the owners of the tug John Nichols, to recover against the schooner yacht Lasca, the sum of $1,000 for salvage services rendered, on the 15th day of September, 1904, in getting the yacht off the beach somewhat inside the western end of Coney Island, near Norton's Point.

On the night of September 14th the yacht was anchored to the northward and westward of Coney Island, about ½ mile distant. Later, a strong blow from the South-east commenced, accompanied by heavy rain. The master let go both anchors, with 30 fathoms of chain on the port and 15 on the starboard. About midnight, the storm lightened up somewhat and became almost calm. The wind started afresh about 1 o'clock on the morning of the 15th. At 2 o'clock it was blowing heavily and the master paid out 50 fathoms on the port anchor and 30 fathoms on the starboard. At 3:30 o'clock a heavy squall from the North North-west came on and the yacht dragged her anchors so fast that the master thought she had parted her cables. She went ashore almost immediately.

In the early morning of the 15th the tug Nichols was lying off Liberty Light. The wind came on so strong that the master could not keep her lights going and he went into Erie Basin, where the tug remained until daybreak, when she started for sea. On the way down, she was informed that a yacht was ashore on Coney Island and the Nichols went to look for her. The yacht was found between 6 and 7 o'clock in the situation described, lying broadside on the beach and so high out of the water that she could be seen under her bilges. The master of the tug hailed her through a megaphone and two men came off in a boat and asked the master of the tug what he would charge to haul the yacht off. He replied $1,000, and they replied that the master of the yacht would probably agree to it, as he was very anxious to get off. They tried to communicate with the latter but owing to the wind could get no response and they went to the yacht. Subsequently the master of the yacht came off. He said he thought $1,000 was too much and

¶ 1. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

that $800 would be fair. The master of the tug declined this amount and the master of the yacht finally agreed to pay the $1,000. He took the tug's hawser ashore with him.

While these negotiations were pending, after 6:30 o'clock, the steward of the yacht, under directions from the master, communicated with the owner, the claimant here, by telephone, who, after being advised that the yacht was ashore but in no danger, and the tug's terms, said that he could not judge of the conditions and told the master to use his own judgment. The owner subsequently went to Coney Island, reaching there about 10 o'clock in the morning and saw the work going on without expressing any disapproval to the tug but said to his own master that the price was an outrageous one and a swindle.

A little before 7 o'clock the hawser from the tug was run through the hawse pipe of the yacht and made fast to her foremast. The tug then stood off and held the yacht till the tide rose sufficiently to move her. Then about 10:30 or 11 o'clock, she was pulled off, uninjured, and towed to Staten Island, reaching there about 12:30 o'clock P. M. A bill for $1,000 was then presented by the tug to the master of the yacht for approval. He at first demurred, but when it was explained to him that the tug was injured in the service, he signed it without further opposition. This bill was subsequently taken possession of by the claimant, when it was presented to him for payment and collection of the contract amount resisted, apparently at the instigation of the yacht's underwriters, because it was thought to be exorbitant.

About 9:30 o'clock, the tug's screw was damaged in the service by one of the blades being broken off and another injured through striking some driftwood which the storm brought off the shore. A new one was required which cost about $175, and 3 days were lost by the tug in putting it on. Her charter value was $75 per day. Her total disbursements and actual loss of time amounted to about $400. There was some risk attending the service to a new hawser, which became chafed, and the tug was subject to some risk herself of getting ashore. She was a large and powerful tug worth about $28,000. The weather was still windy when the services were rendered but not dangerously so. Spray, however, was flying over the yacht in the beginning.

The yacht was about 119 feet long, over all, built of steel, and worth $20,000. She was in danger of "sanding in," as it is called, which is often the result of a vessel remaining ashore in such a situation. An expert in the wrecking business, in response to a telegram from the Atlantic Yacht Club, located in the vicinity, came to the place, with wrecking equipment, about 7 o'clock A. M., while the Nichols was holding the yacht. He testified that a vessel on a sandy beach is apt to bury herself in the beach, through the sand working away from the inside and piling up on the outside, with a tendency to eventually fill the vessel full of sand, if she remains long enough, sometimes breaking her in two; in any event, increasing the difficulty of getting her off the beach.

The claimant urges that the charge of $1,000 was excessive and

exorbitant and that the repudiation of the contract by the claimant should be sustained and an amount not exceeding $300 allowed to the libellants. He cites: Brooks v. Steamer Adirondack (D. C.) 2 Fed. 387; The Sophia Hanson (D. C.) 16 Fed. 144; The Young America (D. C.) 20 Fed. 926; The Baker (C. C.) 25 Fed. 771; The Schiedam (D. C.) 48 Fed. 923; The G. W. Jones (D. C.) 48 Fed. 925.

It is doubtful if the admiralty courts now have the same power to revise salvage contracts as those authorities indicate formerly existed. The matter has recently been before the Supreme Court in The Elfrida, 172 U. S. 186, 19 Sup. Ct. 146, 43 L. Ed. 413, where it was held, that where the stipulated compensation in a salvage contract is dependent upon success, it may be for a larger compensation than quantum meruit and such contract will not be set aside because the compensation is excessive, unless shown to have been corruptly entered into, or made under fraudulent representations, a clear mistake or suppression of important facts, or under circumstances amounting to compulsion, or when its enforcement would be contrary to equity and good conscience. The mere fact that the contract was a hard bargain or that the service was attended with greater or less difficulty than was anticipated, will not justify its abrogation by the court.

But whether the contract is covered by The Elfrida or not, it is apparent that the compensation stipulated for, especially in view of the damage to the tug, was not excessive. The sum does not exceed what would have been awarded as a salvage compensation, without regard to the contract, as in The Schiedam, supra.

Decree for the libellants for $1,000, with interest.