## THE SANTA ROSA et al. (six cases).

(District Court, E. D. South Carolina.  January 26, 1924.)

### No. 859.

Salvage ⬅30—Awards determined for services in releasing stranded ship.

The steamship Santa Rosa, valued, with cargo, stores, and earned freight, after salvage, at $745,000, stranded when approaching Charleston Harbor. She was uninjured and in no danger except in case of storm, and was lightly imbedded in the sand, but unable to extricate herself by her own power. After numerous volunteer tugs had unsuccessfully worked to release her for three days, and the lightering of part of her cargo, a powerful wrecking tug sent by the owners arrived, and the other tugs were dismissed. On the second day thereafter she was floated, chiefly by the use of wrecking anchors and cables furnished by the tug. The services of the first tugs were well directed and meritorious, and may have contributed to the final result. *Held*, that the wrecking tug was entitled to an award of $22,000 and expenses; that the other tugs were also entitled to salvage awards, varying with the extent of their services, the total awards and allowances for expenses and damaged gear and lighterage amounting to approximately $50,000.

In Admiralty. Suits for salvage by Robert H. Lockwood, manager of the steam tugs Waban and Cecilia, by H. S. Walker, master of the steam tug Manomet, by W. H. Williams, master of the steam tug Clincho, by the Merritt & Chapman Derrick & Wrecking Company and another, by the Atlantic Towing Company, owner of the tug McCaulay, and by S. A. Guilds, master of the steam tug Hinton, respectively against the steamship Santa Rosa and cargo. Decrees for libelants.

Miller, Huger, Wilbur & Miller, of Charleston, S. C., for libelants Lockwood, Williams, and Walker.

Miller, Huger, Wilbur & Miller, of Charleston, S. C., and Haight, Smith, Griffin & Deming, and John W. Griffin, all of New York City, for libelants Merritt-Chapman Wrecking Co. and Merritt, Chapman & Scott Corporation.

Lawton & Cunningham, of Savannah, Ga., for libelant Atlantic Towing Co.

Hagood, Rivers & Young, of Charleston, S. C., for libelant Guilds.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (John M. Woolsey and Edwin S. Murphy, both of New York City, of counsel), and Buist & Buist, of Charleston, S. C., for respondents.

SMITH, District Judge. These libels are all libels for salvage, claimed for salvage services performed for the benefit of the steamship Santa Rosa and her cargo. The claimants for the steamship and cargo have appeared and filed their answers, the testimony has been taken, and the cause has been fully heard; the counsel for all parties interested having appeared and been heard. The facts appear to be as follows:

The steamship Santa Rosa, an American vessel owned by the claimant, Grace Steamship Company, was on the 26th of December, 1922, engaged on a voyage from Tocopilla, Chile, to Charleston, S. C. She is a steel steamship of 6,415 tons gross register, built at Philadelphia

in 1917, 404 feet 6 inches in length, and 53 feet 9 inches beam, and about 9,400 tons deadweight. She had on board on the 26th of December, 1922, a full cargo of about 9,000 tons nitrate of soda.

The salvaged value of the steamship, her apparel, etc., was ..... $268,000.00
Salved value of the cargo ................................... 437,500.00
Freight earned value as salved ................................ 34,238.50

$739,738.50
Add value of fuel and stores salved ........................... 4,900.00

Total value salved ..................................... $744,638.50

On December 26, 1922, at 12:20 p. m., the Santa Rosa took the ground at a point about 4½ miles from midway between the entrance jetties to Charleston Harbor and about 6,500 yards from the shore of Morris Island. At the time she took the ground the steamship was proceeding in a fog at a low rate of speed. Her course was nearly due north—N. 1° 30′ W. The wind was light and the sea smooth, and it was about high water. The vessel grounded easily, gradually losing her way until she stopped. Her draught at the time was a little over 28 feet. According to the location made by her master, she grounded within the 30-foot line on the United States Coast Survey Map (No. 1239, issued November 20, 1922), near the spot with the sounding mark of 27 feet. The bottom on which she lay was sand of the description all along the coast of South Carolina, shelving more or less gradually up to the shore line. The characteristic of this sandy bottom is that the sand is constantly shifting more or less. Under the pressure of waves and currents, during the flood tide especially, this sand moves from place to place. During the ebb tide, as a rule, the sand falls and "packs" under the pressure of the falling tide.

Where a vessel strands on such a bottom as this two processes may take place. Sometimes the currents along the shore may "cut under" the ship's bottom and wash away the sand on which the vessel rests, in which case the vessel will sink in the hole thus created until it reaches a point where it will float in the water surrounding it. It cannot sink deeper than it would naturally sink, if floating. Or the shifting sands, piling up against the vessel as an obstacle, will gradually imbed the ship deeper, so that the vessel will appear deeper in the sand, not because the vessel has sunk deeper, but because the level of the sand has risen higher. These processes on this shelving shore are slow, and whilst ultimately one or both may cause the loss of the vessel, yet to a vessel of the size of the Santa Rosa there was no immediate danger either to the ship, its cargo, or its crew. It is true the vessel, as stranded, lay exposed to the open high sea and its assaults, and every vessel so exposed may be said to be in danger. A cyclone or hurricane storm from the seaward might sweep over the vessel and drive it so high on the shore as to make its extrication practically an impossibility; but the season was not that of such storms. As the vessel lay, its cargo could have been saved by lightering, if necessary, and there was thus no immediate danger. There was, however, the need of action as quickly as possible to prevent the vessel becoming further imbedded in the sand from the causes just mentioned. The vessel was herself in-

capable of extricating herself. In attempting to use her own engines for the purpose, they became sanded and temporarily disabled.

Notice of the position of the Santa Rosa having been given to Capt. R. H. Lockwood, in the city of Charleston, he promptly ordered the two tugs of which he was manager, the Cecilia and the Waban, to go to the vessel's assistance. The Cecilia is a good-sized steam tug valued at $38,000. The Waban is a somewhat larger steam tug, with greater horse power, valued at $60,000. They are both reasonably equipped for the purpose of rendering assistance to vessels in distress. The Cecilia arrived at about 3:55 p. m. on the 26th. The Waban arrived a few minutes later. With these two tugs came their manager, Capt. R. H. Lockwood, a tugboat master of long experience, and a master of great experience and skill in handling cases of salvage, especially cases of stranding on the coast of South Carolina.

Shortly after these two tugs, the steam tug Hinton also arrived at the scene. The Hinton is a steam tug about the capacity of the Cecilia. Her value is $28,000. The steam tug Manomet, of approximately the same horse power as the Waban, valued at $30,000, followed shortly afterwards. As each tug arrived, it seems to have laid hold to the vessel and pulled to extricate it. The general direction seems to have been left to Capt. R. H. Lockwood, and the efforts of the tugs were to pull the vessel sternwards, so as to ease her off the shoal in the same direction backwards as she had run on it, towards the deeper water in that direction. Under the testimony this seems to have been the only proper maneuver at the time. These four tugs pulled until the tide fell so low that it was manifestly useless to continue, but had effected no apparent change in the vessel's position. Before the next high water there arrived an additional steam tug, the Clincho, a large and powerful sea-going steam tug, with a draught of over 15 feet, and an indicated horse power of 800, and valued at $70,000. She arrived about 8:45 p. m. and took hold with the others to pull astern at the next high water, say from 10 p. m. on 26th to 2 a. m. on the 27th but with no substantial result, and the same result followed the pull of the same tugs at the next high water, say from 12 m. December 27th to 3 p. m. After this pull, say about 3:15 p. m. a stern anchor was put out from the ship by the Waban, with about 50 fathoms of chain out. Before the next high water there arrived the United States revenue cutter Yamacraw, of a greater estimated horse power than the Clincho, and the steam tug Wm. F. McCauley, valued at $60,000, with an estimated horse power of 600, and shortly after midnight in the early morning of the 28th all these seven tugs pulled on the ship to drag her astern, and a strain was put on the anchor which had been run out astern. The result seems to have been substantially nil, so far as the ship's going astern was concerned, and the anchor could not hold, but came home.

The weather had heretofore been comparatively fair, but prior to or during this pull the wind rose considerably and the sea roughened, and, owing to the danger of fouling among so many tugs towing astern, a change of maneuver was suggested, and some of the tugs took hold ahead. The vessel apparently floated for a few moments, and moved,

how far and where, there is a conflict of testimony about; but there is no doubt that, when the pull ceased, the vessel had shifted her location and radically changed her position and bearing. When the pull began she lay pointing north or north by east, say parallel to the coast line and the apparent lay of the shoal, and when the pull ended she lay pointing northeast by east, or say N. 75° E., with her head pointing to the sea and her stern to the land, and as it were apparently across the lay of the shoal. To what this change was due it is difficult to say. It is equally difficult to say if the vessel's position was bettered thereby. It does not appear that this result was the effect of any intended maneuver, but it apparently resulted from causes beyond the control of the tugs. In the morning of the 28th, after this last pull, the tug Mc-Cauley ran out one of the ship's large bow anchors with over 50 fathoms of chain. During the morning of the 28th the United States Navy tug Umpqua arrived. She is a larger tug than any of the others. In the afternoon of the 28th, near high water, all of the eight tugs pulled on the ship, so as to drag her eastwards towards deeper water, but with no result. That night it was decided to lighten the vessel by lightering some of the cargo, and her other large bow anchor was run out. These anchors were essential to hold the ship in position and prevent her drifting or being forced shoreward as her draught lessened under the lighterage. During the day of the 29th no further pulling operations were attempted, but the day was occupied in lightering the cargo; 9,231 bags, say 840 tons, were taken off the ship, and transferred to barges, and towed to the city of Charleston.

At 8:40 p. m. December 29th, the steam wrecking tug I. J. Merritt arrived. On the 27th of December, about noon, after the failure of the tugs to extricate the ship on the preceding high tides, the owners of the ship had engaged the services of the owners of the I. J. Merritt. The agreement was on the basis of a salvage allowance, all expenses to be assumed by the Merritt companies and "no cure, no pay." The I. J. Merritt left Norfolk at 2:50 p. m. December 27th, and traveling with due dispatch reached the scene at 9 p. m. December 29th. The I. J. Merritt is a large and powerful boat, specially constructed for salvage services. She carries a complete salvage equipment, with among her crew a salvage officer and professional wreckers. Her value and that of her equipment is placed by the special master at $356,269.-13. On the morning of the 30th of December the master of the Santa Rosa notified all the tugs previously engaged in pulling that their services were no longer needed. The United States boats, the Yamacraw and Umpqua, also let go their cables.

In the early morning of the 30th of December the crew of the Merritt laid a specially constructed wrecking anchor, constructed to hold, and weighing about 7,000 pounds. It was laid out with a 200-fathom 15-inch manilla cable rigged on seven-fold anchor purchase through 24-inch blocks and running to the ship's winches. At high water on the morning of the 30th of December, the Merritt and the Umpqua pulling (and a tug called the Bison employed to hold the Umpqua in position) and the ship's engine straining on this anchor, an attempt was made without success to extricate the ship. During the 30th the light-

295 F.—23

erage continued until 4.067 bags, say 370 tons, or 1,200 tons in all, had been removed. In the early afternoon of December 30th the Merritt ran out another large wrecking anchor of about 9,000 pounds to the eastward with 200 fathoms of 15-inch manila cable and 100 fathoms of steel cable, and at high water the Merritt again pulled on the ship, and the ship heaved on both anchors, but, although the ship seemed to move a little, there was no substantial result. After this pull about 300 tons additional of the cargo was lightered out. At high water in the early morning of December 31st with the Merritt towing ahead to the eastward and the vessel straining on both anchors, the vessel, after being dragged about 400 feet over and through the sand on the shoal, reached deep water, where she floated and after a little delay proceeded to Charleston under her own power.

These libels are all filed to recover for salvage services, and in the opinion of the court the case is undoubtedly one for salvage. The vessel after stranding lay in a position where she could neither proceed herself nor be towed by any other vessel, and exposed to all the possibilities, if not probabilities, of damage to herself and her cargo, from the dangers of the open ocean to which she was exposed, and would so continue if not rescued by outside assistance. The difficulties in the case are to decide who are the salvors and what should be the compensation. In the opinion of the court clearly the chief element in the extrication of the ship was the use of the large wrecking anchors and long cables. The "pull" against an immovable object, like a fixed anchor, or a pillar, or large spile, is necessarily more potent than the thrust of a tug's screw against a movable fluid like water. The length of the cable in giving greater weight and elasticity to the pull, as well as making the line of pull more parallel to the surface of the water, instead of down towards the fixed anchors, when the cable is short, is also a material element in the greater efficacy of this pull, to which must be added the powerful leverage from the purchase of the rigging and the winches of the ship. Under all the testimony, and the history of the disaster, it appears that the "pull" which drew the vessel from her position on the shoal was chiefly the one through the long cables to the large fixed wrecking anchors. This rigging, cables, and anchors were all furnished by the I. J. Merritt, and the result of extrication applies only to the position in which the vessel lay when the Merritt began work in the early morning of the 30th of December. If at that time the ship's position had been bettered for ultimate rescue from her position when the tugs first took hold, then pro tanto their services contributed to her ultimate rescue; a fortiori, if it be true that in her last position she could have been rescued by the tugs without the assistance of the Merritt.

Where salvors in good faith render meritorious services in the rescue of a vessel in distress, they cannot be summarily deprived of their just reward because a more powerful assistant may come along, and it be sought to escape the payment to the first on the scene by dealing only with the last. But those services must be meritorious. In a salvage case they must in some degree have contributed to the salving. But while the party in distress may not disregard the service done in his

behalf on his appeal, by summarily dismissing those who have labored for him, he is not bound to allow an incapable would-be salvor to indefinitely continue his vain attempts simply because that salvor was the first to arrive on the scene and begin work. There must be reason in all things. If after full and fair opportunity the first comer is not successful, and 'evidences no reasonable certainty of success, the party to be salved is not bound to continue his services. If a better equipped, more capable, and efficient worker comes along, the party to be salved would then be entirely justified in letting the first go, and availing himself of the second. From the afternoon of December 26th to the afternoon of December 29th there had been five different "pulls" at high water to extricate the ship. Beginning with five tugs and ending with eight (three of which were very large and powerful boats), all these efforts had been failures. The position of the vessel had been radically changed, but not by any preconcerted or intended maneuvers of the would-be salvors. In lieu of lying pointing in the same direction as when she grounded, so that she could be extricated by the same path as that by which she entered, she lay "crosswise" nearly at right angles to her first direction, and as she could not be pulled broadside down the path she came in, nor sternways towards the land, she could only be extricated bow foremost towards the sea.

Whether that position was better or worse depended upon the bottom under the ship. On this sandy shifting coast the floor is not level nor regularly graded. As it shelves down there are "slues" and "bumps" and "shoals," varying the regularity and evenness of the shelve, not varying it much, perhaps, but 3 or 4 inches of clear water below the keel means often safety. If, when the vessel in her changed position, pointing to the open sea, lay with her stern on the bottom, with a rising bump or shoal in front of her, then her position may well have been changed for the worse. In this case it is impossible to say. After a careful study of the very insufficient soundings reported in the testimony, it seems impossible to say whether, with reference to accessibility to deeper water, the vessel was in a better or worse position. She had, however, by the efforts of the tugs, been shifted in her bed and position. This lessened or prevented the banking and bedding of the sand around her, and to that extent rendered her final extrication more easy. All of the tugs acted with promptitude, zeal, and energy, and their action is most commendable. One of the main objects of consideration in salvage cases is to induce salvors to have themselves in readiness and properly equipped to immediately render assistance to vessels in distress. In determining the award in a salvage case, the main consideration is danger to the lives of the salvors, and next to their boats and property. In this case there appears to have been no imminent danger to the lives and boats of the salvors, other than that incident to their vocations, the danger incident to the danger in gaining a livelihood on the seas. Nor does there appear to have been much danger to the lives of the ship's crew, or to her hull and cargo. Nevertheless the case is one where a ship and cargo involving near $750,000 stranded in the face of the open sea were finally restored to a position of safety, where the one could ply her vocation as a transport in commerce and the other be delivered to the consignees.

### I. The I. J. Merritt.

The Merritt left promptly for the scene of the disaster and arrived as early as she could. Her value is greater than that of all the other libeling tugs put together, and her equipment incomparably more efficient. It is to her equipment and its use that the extrication of the vessel was chiefly due, and she undertook the work on true salvage basis; if she failed, she lost all the effort cost her. But she did her work in comparatively fair weather, in less than 48 hours, and very much assisted by the lighterage and consequent lightening of the ship. A fair compensation for the Merritt is $22,000, to which must be added her expenses and disbursements, $3,811.76, or in all $25,811.76. Of the $22,000, four-fifths, or $17,600 should go to the owners of the Merritt, and one-fifth, or $4,400, among the crew in proportion to their monthly wages.

### II. The Cecilia.

The case of the Cecilia and the other tugs stands substantially on the same grounds. The Cecilia was the first to arrive, continued her services practically continuously and until the morning of the 30th, when she was notified that her services were no longer needed. She "stood by" to render assistance and meet any and all unexpected contingencies. The Santa Rosa, a valuable vessel, with a large and valuable cargo, the latter peculiarly liable to damage by water, was stranded in the face of the open sea. It was very necessary that she should have at hand assurance of help to rescue as far as possible, if her peril was heightened by any expected or unexpected change in the weather or her situation; to save the cargo by towing if off in lighters, or hold the vessel from a more perilous change of position. It is exceedingly difficult, beyond this, to determine what was effected by the tugs towards a successful salvage. It is a matter of dispute, and impossible to say, whether the tugs alone could ever have extricated her. The claim of the tugs is that in the changed position of the ship, and with the lightening effected by the removal of about 1,500 tons of her cargo and the higher tide of the morning of the 31st of December, they could have extricated the ship as well as was effected by the Merritt and her anchors under the same favorable circumstances. Perhaps; but the tugs had had their full opportunity. They had struggled for four days and had "pulled" on five tides, and the ship was still in a position as debatable for its peril as when they began. The master of the ship was certainly not bound under such circumstances to allow the tugs to continue their efforts to effect a rescue, which under the circumstances he was not unwarranted in regarding as hopeless, when a better and more certain opportunity seemed to offer itself. He cannot under those circumstances be charged with attempting to "bilk" the tugs of anything they had justly earned.

But great consideration must be given to the inducement to be offered to tugowners to have their boats in readiness and equipped for cases such as the present. That there were a large number of tugs does not necessarily increase the allowance for salvage. It is potency, not number, that counts. A hundred small boats, powerless to effect the rescue, would not be entitled to more for their contribution, if that contribu-

tion in its effective result could have been rendered by one. It may be unfortunate that the number concerned renders the salvage awarded but small to each. Still, under all the circumstances, considering what the tugs did, the promptness and readiness of their action, the assurance of support they gave, the assistance rendered in lightening the vessel, the shifting of the ship from her bed, and the possibility that the ship's position was really bettered by their labor to a point where they might have extricated her, the court is of the opinion that it presents a case for salvage, although not of a high order. In considering the total to be awarded the tugs, the amount to which the government vessels would be entitled, if they claimed, must also be considered. The Cecilia should receive an allowance of $2,500, of which four-fifths should go to the owners of the tug and one-fifth to the crew in proportion to their wages. The owners of the Cecilia should, in addition, receive $500 for the towing of the barge with 4,323 bags of the ship's cargo to Charleston, and the value of her injured or destroyed hawser.

### III. The Waban.

The Waban should receive $2,500 as salvage compensation, to be apportioned four-fifths to the owners of the tug and one-fifth to the crew in proportion to their wages. The owners of the tug should also receive the value of her hawser injured or destroyed.

### IV. The Manomet.

The Manomet should receive $2,500 as salvage compensation, to be apportioned four-fifths to the owners of the tug and one-fifth to the crew in proportion to their wages. The owners of the tug should also receive the cost of the repairs to the tug for the damages sustained by her when she was thrown against the side of the ship.

### V. The Clincho.

The Clincho should receive $2,500 as salvage compensation, to be apportioned four-fifths to the owners of the tug and one-fifth to the crew in proportion to their wages. The owners of the tug should also receive the value of the damaged hawser.

### VI. The Hinton.

The Hinton should receive $2,500 as salvage compensation, to be apportioned four-fifths to the owners of the tug and one-fifth to the crew in proportion to their wages. The owners of the tug should also receive the value of the damaged hawser and the cost of replacing her guard rail.

### VII. The William F. McCauley.

The McCauley arrived more than 24 hours after the other tugs and participated in only the last two "pulls." She should receive as salvage compensation $1,500, to be apportioned four-fifths to the owners of the tug and one-fifth to the crew in proportion to their wages.

### VIII. Robert H. Lockwood.

Capt. Lockwood is a tugmaster and navigator of long experience on this coast. He is a skillful and expert handler of salvage situations un-

der circumstances such as the present, and he seems to have been the person intrusted with the general direction of the operations. Under the testimony it would appear that his operations and maneuvers were well considered and wise. He does not appear to have been responsible for the change of position in the ship's bearing which took place on the "pull" of December 28th. He was constantly at his position, and served faithfully while the tugs were allowed to serve. As he is not a member of any crew, he would not receive any compensation under the awards to the crews. He should receive the sum of $500 as salvage compensation.

This salvage compensation, amounting in all (including what would be the share of the two government vessels) to near $50,000, is hereby decreed and adjudged to be a proper salvage to be paid by the salved property in due proportion to the value salved. The exact total cannot be stated until the damage to the hawsers and the tugs as herein allowed is definitely ascertained. The costs are to be paid by the respondents. It is referred to Arthur M. Huger, Esq., as special commissioner, to examine and ascertain the amounts to be allowed for the injuries and damages to the tugs and hawsers under the decree, and after notice to the counsel in the cause prepare and submit a final decree for the court according to the conclusions herein announced.