## Case No. 9,363.

### The M. B. STETSON.

[1 Lowell, 119.][1]

District Court, D. Massachusetts. Dec., 1866.

SALVAGE—VESSEL AGROUND—SIGNAL OF DISTRESS—IN PERIL—BENEFIT CONFERRED.

1. A vessel driven on one of the islands in Boston harbor in the daytime set her colors union down, and was pulled off and towed to her dock by a tug, whose master had during the same morning, and before the vessel was beached, offered to tow her up for seventy-five dollars. Held, a salvage service.

[Cited in Baker v. Hemenway, Case No. 770.]

2. Salvage is the saving of property from extraordinary sea peril, by persons not bound by any existing contract to render the service. A signal of distress is evidence of such peril; and a vessel driven on shore in a gale, is, while the gale continues, in such peril.

[Cited in The Athenian, 3 Fed. 250.]

3. The remuneration in salvage cases is reckoned with a view to the benefit conferred as

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

well as to the time, trouble. danger, &c., of the salvors, especially when the danger is still present or imminent.

[Cited in The Mary E. Long. 7 Fed. 365; The Dennis Valentine, 47 Fed. 666.]

4. A bark loaded with sugar was driven on shore in the harbor of Boston in a severe gale and was promptly rescued and brought to a wharf, while the gale was still blowing, by a powerful tug. Value saved, $33,000; salvage awarded, $1500.

The bark M. B. Stetson, on her voyage from Cuba, with a cargo of sugars, made Boston harbor before daylight on the morning of the 30th of October, 1866. The wind was blowing very heavily from the south-east, and in the darkness the vessel came to anchor about five hundred yards to windward of George's Island, a place nearer shore than was entirely prudent, if there had been an opportunity to choose the ground. The master thought himself in no special danger, and in the course of the forenoon refused to take the tow-boat D. A. Mills to tow him to Boston at the price of seventy-five dollars. The vessel lay in the same position until soon after one o'clock in the afternoon, when the gale changed to the south-west, and increased in violence, and she parted her starboard chain and dragged towards the island until her stern took the ground, when she swung round and lay nearly broadside on the beach; the tide being between two and three hours' flood. Her port chain continued to hold, and had some effect in preventing the bark from getting as fast on shore as she might otherwise have done. The master immediately set his colors union down, and the same tug saw the signal soon after and promptly came to his assistance, and on the second trial succeeded in throwing a line on board. put on a very high pressure of steam, and after shifting the position of the hawser twice so that the strain would not pull the tug's bows to leeward, dragged the bark off the shore in fifteen or twenty minutes, with some aid from her own crew, who heaved upon the port chain. When the bark floated the master of the tug ordered her chain to be cut. and then towed her to Boston. The whole service occupied less than two hours. Almost immediately upon the vessel being relieved the gale began to moderate, and before high-water it had become comparatively calm. Upon examination it was found that the vessel had not been strained nor otherwise seriously injured, nor had she started any leak, so that the cargo was in perfect order. Both vessel and cargo were the property of the claimant and were together valued at about thirty-three thousand dollars. The tug was a large and powerful vessel of her class, valued at about $18,000. The libellants demanded $5000; the claimant offered $500.

J. C. Dodge. for libellants.

R. H. Dana. Jr., for claimant. The bark was not in much danger; she might probably have been hauled off at high-water by her own crew; the work done and risk run by the tug were not greater than are common in towage services. The master explains his signal by saying that owing to the relative position of the two vessels, the ordinary signal for a tug, which is a color set in the rigging, could not have been seen by the D. A. Mills, which was the nearest steamer from which he could expect assistance, and so he set the only signal that could be seen and understood, which was the flag put at the peak, union down; but that he did not intend this to be taken as a signal of distress, but to attract attention. The service is one of towage merely, and not of salvage. The Princess Alice, 3 W. Rob. Adm. 140; The Albion, 2 Hagg. Adm. 180, note.

LOWELL, District Judge. I cannot doubt that the libellants have performed a salvage service. Salvage is the saving of vessels or other property from peril at sea by persons not bound by any existing contract to render the service. The compensation in the absence of express contract is understood to be contingent upon success, but that is perhaps not absolutely essential to a salvage service when it has been rendered by request. though if that contingency is shown the contract is presumed to be for salvage; the degree of peril is not usually important except as bearing upon the amount of the reward, provided it be something beyond the mere ordinary dangers of the seas. If there is no danger at all, as where a neutral vessel not liable to condemnation by the law of nations, has been retaken from a belligerent who respects and acts upon the law of nations, or where the master of a ship accepts some aid as mere matter of precaution or to accelerate his voyage or the like, no salvage service is rendered. But where the vessel is in actual or apparent danger, or her position or condition is such that she may probably soon be in danger, and the master acts and permits others to act upon that supposition, it would require a strong case of mistake on his part to reduce the service rendered to something less than a salvage service. So that if there were here merely the fact of the signal seen and acted on. it would be very difficult to say that a salvage service was not undertaken by the master's request. I am aware that there are a good many cases in which salvage and towage have been discussed, and which have turned or seemed to turn upon a distinction between those two kinds of service, but the real inquiry in those cases was. not whether the service, but whether the contract was for towage or salvage. If a tug plying in her usual waters takes hold of a vessel and tows her into port, under no express contract, the question is what was the implied contract. If the circumstances were ordinary, we may well infer the usual towage contract; otherwise if the case is one quite out of the ordinary course. In this point of view the amount of danger may be important as a reasonable

test of the probable contract. It is thus that I understand the case of The Princess Alice, 3 W. Rob. Adm. 140, and the others cited by the claimants. But here the evidence of the acts of the parties repels the inference of a towage contract, and so does the situation of the vessel. The James T. Abbott [Case No. 7.202]; The Reward, 1 W. Rob. Adm. 174; The Isabella, 3 Hagg. Adm. 427; The Charles Adolphe, Swab. 153. Speaking generally, it may be said, that the mere fact that a vessel is aground is enough to show that she is in a situation to have a salvage service rendered her. No doubt grounding in a tidal harbor or in the Mississippi river or some similar place, may often be in fact one of the ordinary incidents of navigation and not enough of itself to show danger or distress. But I apprehend it will be difficult to find an adjudged case of a vessel driven ashore in a gale of wind, and assisted while the gale is still blowing, in which any doubt has been expressed of her being in such danger as to be open to salvage.

The question of compensation remains; and this is always a nice and difficult question. Upon a careful examination of the evidence, I am satisfied that the property was in considerable danger, not of destruction, but of further damage. I cannot believe that the master felt then the confident security which he now testifies to. The gale was very severe, and the sea, considering the place, very high, three or four feet high, as the witnesses assert. It must have appeared to the master to be, and it was highly important that prompt relief should be afforded, not to save life, nor to save the ship from destruction, but to prevent damage to some extent to the vessel, and serious damage to the cargo of sugar, which, in case of a leak, must have been much injured. The aid was given with readiness and skill. and to so good purpose, that the small damage incurred is made a ground of argument to lessen its importance; and fairly, so far as it may tend to show that a longer stay on the beach would have had no very bad consequences, but no farther. On the other hand the risk was, as I have said, not of destruction, but of such damage as one or two hours more of pounding and straining might have caused. The bark was in a harbor within reach of assistance, and would in all probability have gotten off at high-water, if not by her own crew, which I think she would not, yet by the aid of other vessels. The case of a vessel stranded in a thoroughfare, is to be distinguished from that of one on a lonely shore, where relief may not be expected, and where the first vessel that offers may probably be the only one available for the purpose. Upon this ground it has sometimes been said that a vessel abandoned in or near a much used harbor, could not be considered derelict in the strict sense. Neither was the danger to the tug very considerable. There was some danger. undoubtedly, arising from the high pressure of steam

necessary to be used; and if this strain should break the machinery there would be great danger, but this was not very probable.

What then should be the reward? Where a vessel on shore in such a place as this in good weather is pulled off by a tug, it has been held that one fair criterion of the value of the service is what the tug would have undertaken to do it for, if payment had been made contingent, upon success. The James T. Abbott [supra]. It is obvious, however, that this rule will not answer for all, or most cases, because it takes into view only one side of the question,—the risk, labor, and expense of the salvors,—without regard to the value of their services to the other party. Where the necessity is more urgent, and no time is given to bargain, and to choose between different offers, another element, namely, what would the owners of the property be willing to give rather than that the service should not be rendered, may fairly be looked at. That a steamer, usually employed at remunerative pay, in towing about a harbor, does not stand precisely on the same footing in respect to salvage, as a vessel kept on purpose for saving life and property, nor as a merchant or passenger steamer deviating from an important voyage to give aid, must also be admitted. The H. B. Foster [Case No. 6.291]. And in this point of view some of the cases concerning tow-boats find their just application.

Taking into consideration all the circumstances, I have concluded that a fair and adequate remuneration for this salvage service is fifteen hundred dollars, which is nearly five per cent of the value saved. Salvage decreed.