## ELROD et al. v. LUCKENBACH S. S. CO., Inc.

District Court, S. D. New York.

Aug. 21, 1945.

William L. Standard, of New York City (Ruth H. Saslow, of New York City, of counsel and on the brief), for libellants.

Burlingham, Veeder, Clark & Hupper, of New York City (Eugene Underwood, of New York City, of counsel), for respondent.

BRIGHT, District Judge.

Libellants, in behalf of themselves and others, sue for compensation for assistance rendered in the salvage of the S.S. Susan V. Luckenbach, belonging to the respondent. They allege, and it is admitted, that they were engaged by the respondent as seamen aboard that steamship, for a voyage commencing at New York on or about January 13, 1942, and that on or about April 10, 1942, that steamship, while at sea, came into collision with the S.S. Nea Hellas. It is further alleged and denied, that after the collision, the respondents and the remainder of the crew were ordered to abandon ship, which was done, and the crew arrived at Suez on April 12, 1942; that on April 13, 1942, the master advised libellants and the crew that the vessel had been located, that it had gone aground, and called for volunteers to assist in the salvage operations; that libellants voluntarily rendered assistance between April 13 and May 31, 1942, which was not their usual duties, and consisted of special duties in which they assisted a special salvage crew to save and finally make the steamship seaworthy. It is further alleged and denied

that in the work libellants were subjected to special dangers of fire, they were without life boats, the vessel was subject to air raids and attack from enemy craft, was filled with water, there were no sanitary facilities, and the special salvage crew was frequently one-half mile away during the night. It is further alleged and denied that as a result of their work, the steamship was brought to Suez, and was able eventually to be repaired and complete her original voyage.

 The law applicable seems fairly well settled. To earn salvage, there must be (1) a marine peril, (2) services voluntarily rendered when not required as an existing duty or from a special contract, and (3) success in whole or in part, or that the services rendered contributed to such success. The Sabine, 101 U.S. 384, 25 L.Ed. 982. A person who renders such service is called a salvor, and he is one who, without any particular relation to the ship in distress, proffers useful service and gives it as a volunteer adventurer without any pre-existing contract that connected him with a duty of employing himself for the preservation of the vessel. Seamen belonging to the ship cannot, as a general rule, claim compensation, not only because it is their duty to save both ship and cargo, if it is in their power, but because it would be unwise to tempt them to get the ship and cargo into a position of danger in order that by extreme exertion they might claim salvage compensation. The Clarita, 23 Wall. 1, 90 U.S. 1, 16, 17, 23 L.Ed. 146, 150. Judge Lacombe, in The C. P. Minch, 2 Cir., 73 F. 859, 864, after an extensive review of the cases upon the subject, wrote:

"Upon the question as to what is sufficient evidence of abandonment, reference may be had to Clarke v. The Dodge Healy, Fed.Cas.No.2,849, 4 Wash.C.C. 651, which in some respects resembles The John Perkins, supra. * * * The mate then left. The brig was subsequently saved. There was no question in this case of seamen's salvage, but the court discusses the subject of abandonment. It is suggested that, when such a question arises, one's actual intention is best determined by acts, rather than by declarations, contemporaneous or subsequent. After discussing all the facts, Judge Washington says:

" 'I am, in short, quite satisfied that an abandonment of the brig, without the intention to return to her in case she should escape the danger that threatened her, was at no period of time in the contemplation of the mate; and that, when he spoke of her being abandoned, he was far from annexing a technical meaning to the phrase, but merely intended to express the danger he apprehended her to be in, and his abandonment of the possession of her until the danger should be over, or should appear to be less imminent. I consider the brig as having at no period of time been out of the constructive possession of the owners. * * * She was deserted on account of an immediate danger, and only during such danger; but animo revertendi if the danger should pass away. She was watched by the mate, and was always in his view whilst on shore.'

\* \* \* \* \* \*

"From this review of the authorities, it is apparent that, in every case where compensation in the nature of salvage has been awarded to seamen, the voyage has terminated by the shipwreck of the vessel, which has either gone to the bottom or left her bones on the shore, or she has been abandoned by all, or by all except the salvors, under circumstances which show conclusively that the abandonment was absolute, without hope or expectation of recovery, or the seaman has been by the master unmistakably discharged from the service of the shipowner. * * *

"The acts of the captain in hurrying at once to the tug, and the request he made of its master, show conclusively that he had not abandoned all hope of saving the schooner."

To the same effect, see The Island City, 1 Black 121-128, 66 U.S. 1, 17 L.Ed. 70; The Macona, D.C., 269 F. 468; Drevas v. United States, D.C., 58 F.Supp. 1008, 1945 A.M.C. 254.

The facts admit of very little dispute. Libellants were the members of the crew of the Susan; Elrod the boatswain, Gillespie an oiler, Robert the carpenter, and Fenn a wiper. In January 1942, they had signed on for a foreign voyage for twelve months. Their vessel had discharged its cargo at Suez, and was proceeding under ballast toward Aden on April 10, 1942, and at about 11:14 in the evening, the vessel was struck on the port side abreast of No. 5 hatch by H.M.S. Nea Hellas, carrying troops for Suez. The collision tore a hole in the port side of the Susan, ten or twelve feet into the ship, and for its full depth. The vessel began making water rapidly, water entered the No. 4 hatch, the shaft

alley was full of water, and the bulkhead between No. 4 and the engine room was leaking badly. The captain tried for five hours to get the ship back to Suez, until about 4:20 A. M. on April 11th, when he was informed by the chief engineer that he was unable to keep the ship afloat. The master then tried to beach the ship, but five minutes later, it looked as if the bulkhead between No. 4 and No. 5 hatches had collapsed. "Abandon ship" was then sounded, the crew was ordered to take to the boats, and the ship was placed in position with relation to the beach and the wind that she would beach herself if she remained afloat for a few more minutes. The Nea Hellas, which had stood by during the proceedings, picked up all of the crew and took them to Suez, where they were housed at the Grand Hotel, and remained there until they returned to the ship. Robert testified that the captain told the crew in the hotel that they were still all members of the crew and that he was going to see if he could locate the ship.

The captain testified that when he ordered the crew to the boat, his intention was to take care of them, that he certainly had no intention of abandoning the ship, and that his subsequent action proved that he intended to return to the ship. When he went up on the bridge of the Nea Hellas, after being rescued from the boat, he had the captain radio the British Admiralty in Suez requesting that arrangements be made to take care of the Susan. Upon his arrival in Suez, he reported to the Admiralty and requested transportation to where he believed the Susan may have been beached, and that a salvage officer go with him to make the survey. The request was granted, and the master and the salvage officer left the same day and proceeded to where the ship had grounded in the Gulf of Suez. They boarded the vessel on April 12th, decided that salvage operations could be effected, and immediately radioed to the Admiralty requesting salvage service.

The captain then returned to Suez, met the crew, explained the conditions in which he had found the Susan, and advised them to stand by, that he might call on them at any time, as they were going to make an effort to salvage the ship. He asked for volunteers, every member of the crew responded, and four were selected, the chief officer McCandlish, the chief engineer Patterson, Elrod, Fenn and the steward Taylor.

Elrod testified that the captain also explained the condition of the vessel, stating that there was a little water in the quartermaster's fo'c's'le, that the vessel was sitting on a coral reef approximately around the forward end of No. 4 hatch on the port side, resting in such a manner that she had a list, and was up at the bow and down at the stern.

The services of The Confederate, a tug especially equipped for salvage, with a crew of 40 or 50, was employed by the master to do the work. The tug, with the captain and the members of the crew mentioned, returned to the Susan on April 15, 1942, and the work of placing a patch over the hole in the port side, pumping out the water, and towing the vessel back to Suez, continued until May 30th. Elrod remained on the Susan the entire period, Fenn until May 10th and was replaced by Gillespie, who was on the vessel from May 16th to May 20th. Robert was not upon the ship at any time during the work, and did not come aboard until she had been returned to Suez on May 31st. Those of the crew mentioned, who were on the ship, including the captain and the officers, during the periods mentioned, did what they could to assist the specially engaged salvage crew in the salvage work.

When the vessel arrived at Suez on May 30th, the captain of the tug The Confederate advised the captain of Susan that from then on his responsibility toward the vessel had ended, and that the captain of the Susan was thereafter responsible now that she was afloat and in safe anchorage. The ship was later placed in drydock on July 3rd or 4th, and the repairs completed. The crew rejoined the ship prior to the drydocking some time in June, except that some of them were evacuated down the coast by the American Consul because of the advance of General Rommel's army in Africa, and it was feared that they would take Alexandria and even the Suez Canal. They returned to the vessel in August, and she sailed late in October or early November for New York, arriving there on March 2nd 1943, and the crew signed off on March 10th.

No new articles were signed by the crew. Nothing was done to those already signed, and there was no suggestion at any time that the voyage had been abandoned or that the articles were abrogated. Advances of pay were made from time to time to the

crew, the payment of allotments was continued to crew dependents without interruption, and the crew was paid off under the articles signed at the beginning of the voyage. They were all paid their wages from the time they joined the ship until they left it. When they were paid off before the Shipping Commissioner, protests were made as to the failure of payment of certain bonuses, and a decision upon that subject was rendered by the Maritime War Emergency Board, settling the dispute. It appeared that at the time of the trial, Elrod still had claims existing which he claimed should be paid under the articles signed by him.

This recital of facts, which are practically without dispute, convinces me that there was never any absolute abandonment of the ship without hope of returning or expectation to recover. That being so, the libellants have failed in their proof, and their libel must be dismissed.