**B.V. BUREAU WIJSMULLER,**
Plaintiff-Appellant-Cross-Appellee,

v.

**The UNITED STATES of America,**
Defendant-Appellee-Cross-Appellant.

**Nos. 69, 133, Dockets 82–6050, 82–6090.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 2, 1982.

Decided March 2, 1983.

Richard M. Ziccardi, New York City (Gordon W. Paulsen and Curtis E. Pew, Haight, Gardner, Poor & Havens, New York City, of counsel), for plaintiff-appellant-cross-appellee.

Janis G. Schulmeisters, New York City (J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., and John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, of counsel), for defendant-appellee-cross-appellant.

Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

The law of salvage is a concept with roots deeply embedded in antiquity. We are called upon to apply this old and venerable law to a case involving modern shipping. On this appeal we review the propriety of a $500,000 award for salvage services to which the United States District Court for the Southern District of New York (Goettel, J.) added $135,000 as an "equitable uplift." Our reasons for affirming follow.

### FACTS

In August 1977 the M.V. PIONEER COMMANDER, a vessel privately owned by United States Lines, Inc., set sail from Bremerhaven, West Germany for Bayonne, New Jersey. Aboard the vessel were 757 tons of military cargo owned by the defendant United States of America. The value of this cargo and the ship's bunkers was fixed by the district court at $6,480,925.

On August 13, 1977 the ship ran aground on a rocky ledge off the northern coast of Scotland. Although two of the ship's bottom plates were cracked, its watertight integrity was unimpaired. Attempts to extricate itself under its own power and with local help were unavailing. Realizing the gravity of the situation, the captain radioed a request for professional salvage assistance; the plaintiff, B.V. Bureau Wijsmuller (Wijsmuller) a professional salvor from the Netherlands, responded. Upon receipt of the call, Wijsmuller immediately dispatched its tug TYPHOON to the scene.

Radio contact was established between the TYPHOON and the grounded ship. The master of the PIONEER COMMANDER asked for a lightering craft in order to discharge the ship's bunkers. This message, together with a request that a salvage officer be flown in, was passed on to Wijsmuller's main office by the master of the TYPHOON.

Three hours later the tug arrived at the scene. Before salvage operations began Captain Scott, master of the PIONEER COMMANDER, entered into an agreement with Wijsmuller under which Wijsmuller would use its best efforts to salve the vessel. The contract—"Lloyd's Standard Form of Salvage Agreement—No Cure-No Pay" —provided that if successful in its efforts to refloat the casualty, Wijsmuller would be paid a salvage award in an amount to be later determined; if unsuccessful, Wijsmuller would receive no payment. Additionally, the contract contained an "equitable uplift" provision intended to protect the salvor from the effects of currency fluctuations and inflation.

Salvage operations commenced the same day. Using the tug's small boat, soundings were taken all around the PIONEER COMMANDER. Various specifications, particularly the ship's departure drafts, were provided by Captain Scott. Unfortunately, because these drafts were taken when the ship was in brackish water, they were inaccurate for seawater.

The following day divers surveyed the situation underwater. The vessel's bow and stern hung over deep water so that the TYPHOON could navigate up to and alongside her. Later that day a salvage officer, Captain Hopman, flew in from Holland to take command of the salvage operation. Upon boarding the stranded vessel, Captain Hopman observed the considerable effect of the strong tidal currents. Moreover, the spring tide which intensified those currents was to peak in only four days, on August 18. Unpredictable weather capable of sudden deterioration greatly concerned Captain Hopman. He suggested that the vessel be ballasted down so that she would hold her

present position. As a further precaution he decided to lay out beaching gear from the stern of the PIONEER COMMANDER. In this way she could swing freely and avoid a rock formation on her starboard side, if she came afloat.

Further calculations indicated that the vessel was held fast about three feet below her mean average draft and that she would have to be lightened to achieve flotation. On the 15th a sounding survey was carried out aft of the ship in order to establish the best route by which she could be refloated. An unsuccessful attempt was made by the TYPHOON to pull the vessel off the strand. The beaching gear was rigged using the PIONEER COMMANDER's spare anchor which was moved to her stern and then taken on board the salvage tug. This work was not completed until August 17.

Because of the possibility of an oil spill, the tanker MARE SILENTIUM, which had been chartered for the purpose of emptying the PIONEER COMMANDER's bunkers, came alongside the casualty on the afternoon of August 17. During a nighttime pumping operation, the MARE SILENTIUM's bridge and forecastle were damaged when powerful waves, induced by the ever-increasing current caused her to roll against the PIONEER COMMANDER. The pumping operation was soon discontinued as the sea grew steadily rougher. In disengaging from the stranded vessel, the tanker sustained further damage by again rolling into the PIONEER COMMANDER.

On August 18 the spring tide peaked. Shocks were felt running through the vessel and a slight change in her heading occurred. These vibrations continued until the tide ebbed. Owing to the heavy damage sustained the previous day, the master of the MARE SILENTIUM agreed to resume defueling only after Wijsmuller promised to indemnify her owners for any damage not covered by insurance. Because the mooring ropes and bunker hose parted, defueling could not begin, and again the TYPHOON had to tow the tanker to safety.

A decision had been made previously to attempt refloatation on August 19. To this end deballasting had begun on the 16th. The deballasting process was painfully slow because the fuel which was being removed to lighten the ship was unheated and, therefore, viscous. Only 310 tons of fuel had been removed when weather conditions halted the defueling operation.

At 0150 hours on August 20 a substantial vibration shook the PIONEER COMMANDER, altering her heading 20 degrees to starboard. When this occurred the PIONEER COMMANDER was ballasted down, but the TYPHOON was not secured to her and the beaching gear was not tensioned. As the change in the heading became more pronounced, Captain Scott had Captain Hopman awakened. The beaching gear was immediately tensioned and the TYPHOON came alongside the PIONEER COMMANDER. A line was passed and pulling commenced at 0235 hours. The beaching gear was engaged in conjunction with the PIONEER COMMANDER's capstan, and the vessel's engines were started simultaneously. Just short of an hour later the PIONEER COMMANDER floated free. The fast release hook of the beaching gear supplied by Wijsmuller jammed; the line had to be cut and the anchor was lost. The main engines of the casualty, which had been running full astern, were immediately stopped. The TYPHOON then towed the PIONEER COMMANDER into deep water and escorted it to Scapa Flow.

On August 23, again escorted by the TYPHOON, the PIONEER COMMANDER sailed for Newcastle, England. During the passage the TYPHOON, which accompanied the vessel at the request of United States Line, Inc., provided no further assistance. On August 24 the salvage services were completed upon the issuance of a Certificate of Delivery.

Pursuant to the salvage agreement entered into between Wijsmuller and the master of the PIONEER COMMANDER, an arbitration was held in London. A salvage award was made against the United States Lines as owner of the vessel and against the United States as owner of the cargo and bunkers. Invoking the doctrine of sover-

eign immunity, the United States refused to participate in that arbitration and has since refused to pay its share of the arbitrator's award.

The district court found that the refloatation of the vessel on August 20—although a surprise to the salvage officer—occurred because of its reballasting on August 18 and 19 which adjusted its trim aft. With the vessel weighted heavily aft, the swift current and large swells at night's high tide apparently caused it to pivot and move astern. The trial court found that Wijsmuller's services had been rendered in a professional manner and that the salvage plan would have been effective had the difficulties recited in removing the bunkers not been encountered. It also found that the laying out of the beaching gear and the tug's assistance when the vessel came alive were important to safe removal from the strand.

In making its findings the district court placed the value of Wijsmuller's salvage services at $500,000. It added an "equitable uplift" factor of 27 percent to the award for a total of $635,000, together with four percent interest. In making this addition to the award, the trial court cited its broad discretion in fixing salvage awards and the delay incurred by Wijsmuller in recovering this award from the United States. Both parties appeal, contesting the amount of the award. Wijsmuller claims that the court below erred by improperly applying the relevant salvage criteria and by refusing to reopen the trial in order to admit new evidence. The United States argues that the imposition of the "equitable uplift" exceeded the district court's authority.

## DISCUSSION

### I

Unknown to the common law, the law of salvage occupies a unique position in the Anglo-American legal system. In *Mason v. The Ship Blaireau*, 6 U.S. (2 Cranch) 143, 2 L.Ed. 266 (1804), Chief Justice Marshall commented that when property on land exposed to grave peril is saved by a volunteer, no remuneration is given. "Let precisely the same service, at precisely the same hazard, [b]e rendered at sea, and a very ample reward will be bestowed in the courts of justice." *Id.* at 158; *see Wright v. The Felix*, 62 F. 620, 621 (E.D.Pa.1894).

■ The history of salvage law dates back to the earliest civilizations. Although Phoenicia, Carthage and Athens were distinguished for their navigation and commerce, none of them founded an authoritative digest of maritime law. Rhodes, the cradle of nautical jurisprudence, was sovereign of the seas about 900 years before the Christian era and it was the Rhodians who formulated the first maritime code. The Romans who conquered Rhodes preserved these laws. Emperor Augustus first sanctioned the use of Rhodian laws to decide maritime cases in Rome. The Romans added the notion of rewarding a volunteer who preserved or improved the property of another, even though such act was without the owner's knowledge or consent. This concept was carried under the title "Rhodian Code" into the marine law of various European countries. Anglo-American jurisprudence adopted this equitable doctrine from the Romans, providing for a reward to the salvor volunteer for his efforts based on the circumstances of the case, and proportionate to the dangers involved. *The Felix*, 62 F. at 621–22; *The "Calypso"*, 166 Eng. Rep. 221, 224 (1828); *see* 3A M. Norris, *Benedict on Admiralty* §§ 5–11 (6th ed. 1980) (*Benedict*); 3 Kent's *Commentaries* 1–5 (12th ed. 1873).

■ The law of salvage originated to preserve property and promote commerce.[1]

---

1. While the wish to protect human life may have played a role in the historical development of salvage law, it was not the prime motivating factor. The Brussels Convention of 1910, which conformed international law to that generally applicable in the United States, G. Gilmore & C. Black, Jr., *The Law of Admiralty* § 8–1, at 534 (2d ed. 1975), expressly provided that no remuneration was due from people whose lives were saved. Two years later the United States enacted the Salvage Act which rewarded salvors who saved human life.

*See Seven Coal Barges,* 21 F.Cas. 1096, 1097 (C.C.D.Ind.1870) (No. 12,677) ("The very object of the law of salvage is to promote commerce and trade, and the general interests of the country, by preventing the destruction of property . . . ."); Palaez, *Salvage—A New Look at an Old Concept,* 7 J.Mar.L. & Com. 505 (1976). These remain its most compelling goals. In order to accomplish these purposes courts of admiralty do not view salvage awards therefore "merely as pay, on the principal of a *quantum meruit,* or as a remuneration *pro opere et labore,* but as a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." *The Blackwall,* 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1870); *see Benedict, supra,* § 235. For these reasons courts sitting in admiralty are liberal in fixing awards. *The Felix,* 62 F. at 622.

## II

■ Salvage, simply stated, is the "service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended."[2] *McConnochie v. Kerr,* 9 F. 50, 53 (S.D.N.Y.1881), *modified sub nom. McConnochin v. Kerr,* 15 F. 545 (C.C.S.D.N.Y.1883); *see The Neshaminy,* 228 F. 285, 288 (3d Cir.1915); *Phelan v. Minges,* 170 F.Supp. 826, 828 (D.Mass.1959). To determine that a salvage service (as distinct, for example, from a towing service) was performed, a court must find three specific elements: marine peril; service voluntarily rendered, not required by duty or contract; and success in whole or in part, with the service rendered having contributed to such success. *The "Sabine",* 101 U.S. 384, 25 L.Ed. 982 (1880); *see Elrod v. Luckenbach S.S. Co.,* 62 F.Supp. 935, 936 (S.D.N.Y. 1945).

■ Peril necessary to give rise to a claim for salvage must be present and impending, although it need not be immediate or absolute. "A situation of actual apprehension, though not of actual danger, is sufficient." *The Plymouth Rock,* 9 F. 413, 416 (S.D.N.Y.1881); *see The Saragossa,* 21 F.Cas. 425 (S.D.N.Y.1867) (Nos. 12,334 & 12,335). "[R]easonable apprehension of injury or destruction if the services are not rendered" is the standard by which peril is adjudged to be present. *Phelan,* 170 F.Supp. at 828; *see Benedict, supra,* §§ 63, 65. Absent danger, any services rendered a vessel cannot properly be called salvage and a person rendering such unnecessary service is not styled a salvor but "an opportunist or an officious intermeddler," *Phelan,* 170 F.Supp. at 828.

■ A vessel stranded upon rocks clearly has a reasonable apprehension of injury. In *The Santa Rosa,* 295 F. 350 (E.D.S.C.1924), the distressed vessel ran aground off the coast of South Carolina. Although there was no immediate danger, the ship was exposed to "all the possibilities, if not probabilities," of peril faced by a grounded vessel. *Id.* at 354. In *The M.B. Stetson,* 16 F.Cas. 1272, 1274 (D.Mass.1866) (No. 9,363), the court stated, "[s]peaking generally, it may be said, that the mere fact that a vessel is aground is enough to show that she is in a situation to have a salvage service rendered her." *See The Athenian,* 3 F. 248, 250 (E.D.Mich.1877); *The James T. Abbott,* 13 F.Cas. 340 (D.Mass.1864) (No. 7,202); *cf. La Rue v. United Fruit Co.,* 181 F.2d 895 (4th Cir.1950) (service rendered to a vessel grounded in soft mud is not salvage).

■ The second element is voluntary service. Voluntary service, the *sine qua non* of marine salvage, is rendered in the absence of a legal duty or obligation. *See*

---

*See* 46 U.S.C. § 729 (1976). *See generally* Note, *What the Boat Owner Should Know About Salvage Law,* 37 Temple L.Q. 506, 508 (1964).

**2.** For other definitions see *The "Sabine",* 101 U.S. 384, 25 L.Ed. 982 (1880); *The Clarita and*

*The Clara,* 90 U.S. (23 Wall.) 1, 23 L.Ed. 146, 150 (1875); *The Blackwall,* 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1870); *The Catalina,* 105 F. 633 (5th Cir.1900); *Squires v. The Ionian Leader,* 100 F.Supp. 829 (D.N.J.1951).

*The Clarita and The Clara,* 90 U.S. (23 Wall.) 1, 16–17, 23 L.Ed. 146, 150 (1875); *Elrod,* 62 F.Supp. at 936. Whatever motive impels the true volunteer, be it monetary gain, humanitarian purposes or merely error, it will not detract from the status accorded him by law. *Benedict, supra,* § 68 at 6–2. Thus professional salvors—who perform their services for monetary gain—may claim salvage awards. *The Camanche,* 75 U.S. (8 Wall.) 448, 19 L.Ed. 397 (1869).

■ The final component is success in whole or in part with the service rendered by the salvor having contributed to the ultimate success. Lack of success precludes the granting of a salvage award.[3] *The Blackwall,* 77 U.S. at 12; *see The Felix,* 62 F. at 622; *Benedict, supra,* § 88. The underlying rationale for this rule is that the purpose of engaging in a salvage operation is to render a beneficial service to the owner or vessel. When no benefit is conferred, the salvor is precluded from obtaining a reward. *The Enos Soule,* 95 F. 483, 484–85 (S.D.N.Y.1899).

■ Wijsmuller clearly performed a salvage service. As a voluntary—although professional—salvor, Wijsmuller professionally conducted the salvage operation and ultimately succeeded in extricating the PIONEER COMMANDER from its peril. A vessel stranded upon a rocky ledge is at the mercy of the wind and the water. The PIONEER COMMANDER and her salvor were confronted with a heaving sea, an onrushing spring tide, and the likelihood in this North Sea location that the weather might suddenly worsen. If and when this occurred large swells would boil into a raging sea and the stricken ship might possibly be lost. A potential loss of the military cargo aboard the ship was not insignificant and the discharge of the ship's bunkers into the ocean could have had severe ecological consequences to a nearby bird sanctuary.

The request of United Kingdom environmental authorities that remedial action be taken to prevent such an oil spill surely should have been a matter of concern to the defendant, United States, as owner of the oil aboard the stricken ship. Unquestionably, in this case there was marine peril.

### III

■ There remains the propriety of the award to Wijsmuller in the amount of $500,000 for the salvage services it rendered. The *Blackwall* factors are those traditionally considered by a court when it makes a salvage award. 77 U.S. at 13–14. A leading commentator has rearranged them in descending order of importance as follows: (1) degree of danger from which the property was rescued; (2) value of the property saved; (3) risk incurred in saving the property from the impending peril; (4) promptitude and skill displayed; (5) value of the property employed by the salvors and the danger to which it was exposed; and (6) labor expended in rendering the salvage service. *Benedict, supra,* § 237. We adopt this view.

■ Other rules, which provide a broad framework within which to apply the *Blackwall* factors, guide a court in fashioning à salvage award. First, the peculiar circumstances of each case must be considered. The "intelligent guess" which an admiralty court must make, *The Rescue v. The George B. Roberts,* 64 F. 139, 140 (E.D. Pa.1894), can seldom be guided by dependable precedent since salvage cases are rarely alike, *Benedict, supra,* § 239. Also, it has generally been agreed that fixed percentages of value and comparisons to percentages from previous awards should play no role in the salvage award. *See The High Cliff,* 271 F. 202, 203 (2d Cir.1921) (fixed percentage); *The Steam-Ship Samana v. The Erin,* 36 F. 712, 714 (E.D.N.Y.1888)[4]

---

**3.** With a recent exception for the salvage of tankers, Clause 1(a) of the "Lloyd's Standard Form of Salvage Agreement" embodies the concept of no cure-no pay.

**4.** "[N]o fixed rule for determining the amount of salvage awards can be based on a comparison of percentages. Where the value is large, the percentage may for that reason be less. Where the value saved is small, the percentage must be higher, in order to give adequate re-

(comparison of percentages); *see generally* G. Gilmore & C. Black, Jr., *The Law of Admiralty* § 8–10 (2d ed. 1975). Instead, the equitable method of fixing a just award is to consider *all* of the *Blackwall* factors. Finally, a professional salvor is entitled to a more liberal award than a chance salvor. *The Lamington,* 86 F. 675, 684 (2d Cir.1898); *Fred Devine v. United Transportation Co.,* 1957 A.M.C. 175, 181 (W.D.Wash.1956). This view results from the realization that professional salvors possess unique skills and must maintain expensive equipment particularly suited for dangerous work. *See Merritt & Chapman Derrick & Wrecking Co. v. United States (The El Sol),* 1927 A.M.C. 708, 710 (Ct.Cl.1927).

■ Turning to the award made in the present case, the most significant factor is the degree of danger from which the property was rescued. Here the vessel was clearly in a position of peril. Fortunately, the weather was good during the time of the salvage operation and for several more days. The "peril which can be properly considered in determining a salvage award is not to be estimated in the light of subsequent or contingent events, but of the facts which surround the salvage service at the time that it is rendered," *Benedict, supra,* § 249 (footnote omitted); *see The Neshaminy,* 228 F. at 289; *The Felix,* 62 F. at 621.

As for the value of the property salved only the value of the cargo and bunkers is involved in this litigation. While only a rough approximation of value is necessary to make a salvage award, *Rand v. Lockwood,* 16 F.2d 757, 759–60 (4th Cir.1927), the trial court went further and calculated the value of the ship's cargo and bunkers at precisely $6,480,925.

■ The third element—the "risk or danger to which salvors are exposed [—] should be considered in the light of the hazards which are normally encountered by men who go to sea. It is risks out of the ordinary for men of that calling which are ward." *The Steam-Ship Samana v. The Erin,*

recognized and liberally rewarded in salvage cases." *Benedict, supra,* § 264 at 21–15 (footnote omitted). The district court's observation that there did not appear to be any danger to the lives of the salvors or their property is supported by the record and was properly considered. *See The Bretanier,* 267 F. 178, 179 (4th Cir.1920).

■ The salvor's promptitude and skill are next considered. Salvors who show zeal and energy in their work will be rewarded with an enhanced recompense; salvors who do not, run the risk of a diminished award. The proficiency required to be exhibited by a salvor is that of ordinary skill in the pursuit of a salvage undertaking. Extraordinary skill and careful preparation may cause the court to enhance the award. The court below concluded that plaintiff was entitled to a liberal award "but not as great as that to which it would have been entitled had the vessel been refloated pursuant to the salvage plan." According to Wijsmuller this is an erroneous statement. Wijsmuller argues that the successful salvage operation ordinarily requires some good luck and that the district court's statement erroneously implies that an award may be reduced simply because the salvor has benefited from good fortune. We disagree with Wijsmuller's interpretation of the court's conclusion. In light of all the other findings, we believe that the district court was here referring to the fact that had Wijsmuller been required to refloat the M.V. PIONEER COMMANDER according to plan, it would have had to carry out the risky and costly task of unloading the oil on the stranded vessel on to the MARE SILENTIUM. Previous attempts to unload the oil in the rough sea had caused considerable damage to the MARE SILENTIUM. Had Wijsmuller incurred this cost and engaged in this risky activity, it would have been entitled to an even more generous award, in accordance with the third, fourth and sixth factors in the *Blackwall* analysis, enumerated above.

36 F. 712, 714 (E.D.N.Y.1888).

Given this understanding of the district court's conclusion the statement that Wijsmuller was entitled to less because it did not complete the salvage plan is entirely reasonable.

The value of the salving property did not appear to play a significant role in the district court's award. We note that while the TYPHOON is an extraordinarily powerful tug and obviously a valuable piece of property, it was not exposed to great danger during the salvage operation. The final element, time and labor expended by the salvor, were found by the district court to be approximately $100,000.

■ In fixing its award the trial court appropriately considered the broad guidelines. Wijsmuller's status as a professional salvor was noted, the award was not improperly made on a fixed percentage basis and the court's "intelligent guess" appears fair.

### IV

■ After reviewing the *Blackwall* factors the trial court awarded $500,000. Applying an "equitable uplift" factor of 27 percent, the court then raised the total award to $635,000. In its cross-appeal the government claims that this "equitable uplift" was erroneous and argues that 46 U.S.C. § 743 (1976) is the sole remedy for the effect of inflation. Section 743 provides that a decree may include "interest at a rate of 4 percentum per annum until satisfied, or at any higher rate which shall be stipulated in any contract upon which such decree shall be based." Wijsmuller concedes, as it must, that the United States was not bound by the Lloyd's Standard Form of Salvage Agreement between Wijsmuller and the owner of the vessel because the government was not a party to it. Because the government was not subject to the "equitable uplift" provision of the Lloyd's agreement, the government contends that the court exceeded its authority by taking into consideration the effects of inflation.

■ We hold that it was proper to apply an "equitable uplift" factor to Wijsmuller's award taking inflation as a factor into account. Because the Suits in Admiralty Act provides for prejudgment interest computed at the paltry rate of 4 percent, 46 U.S.C. § 743, parties seeking an admiralty award from the United States have less protection against inflation than parties seeking an award from a private party, *compare United States v. Isthmian Steamship Co.*, 359 U.S. 314, 79 S.Ct. 857, 3 L.Ed.2d 845 (1959) *with Independent Bulk Transfer v. Vessel "Morania Abaco"*, 676 F.2d 23 (2d Cir.1982).

■ Plainly, we have no power to invent remedies to relieve private parties from the burdens imposed by the doctrine of sovereign immunity. Unless specifically authorized by statute, Wijsmuller has no right to an award from the United States, even if its services saved American taxpayers money. The United States has absolute power to dictate the sole conditions under which Wijsmuller may bring suit against it. It has done so in the Suits in Admiralty Act, 46 U.S.C. §§ 741–752. Nonetheless, that Act does contemplate application of the general principles of admiralty law in cases involving the United States where no contrary rule is specified. While authority is sparse, courts have in the past taken inflation into account in determining a salvage award involving private parties, *Waterman S.S. Corp. v. Dean*, 171 F.2d 408 (4th Cir.1948), *cert. denied*, 337 U.S. 924, 69 S.Ct. 1171, 93 L.Ed. 1732 (1949), and their action has been favorably viewed by distinguished commentators, G. Gilmore & C. Black, Jr., *The Law of Admiralty* § 8–10, at 564 (2d ed. 1975). We conclude therefore that the District Court's use of the Consumer Price Index in determining the amount of the award an appropriate exercise of its discretion.

### V

■ Plaintiff's remaining contention warrants little discussion. Wijsmuller argues that the district court should have received into evidence what it claims is an admission by a party opponent. Whether

the statement can be so categorized is irrelevant since it appears from the district court's memorandum that the trial had been concluded and plaintiff's motion to admit the evidence was in reality merely one to reopen pursuant to Federal Rule of Civil Procedure 59(a)(2).[5]  Such a motion is addressed to the sound discretion of the district court.  *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 331–32, 91 S.Ct. 795, 802–03, 28 L.Ed.2d 77 (1970);  6A J. Moore, *Moore's Federal Practice* ¶ 59.04[13], at 59–31 (2d ed. 1979).  Finding the statement to be a "generalized opinion having no direct bearing on this case," the district court correctly refused to grant the motion.

Generally an appellate court will not reverse a salvage award unless the district court yielded to an erroneous principle, plainly misapprehended the facts, *The Joseph F. Clinton,* 250 F. 977, 979 (2d Cir. 1918), or granted an award that was clearly inadequate or unreasonably excessive, *The High Cliff,* 271 F. at 203.  Finding no such errors in the award, the judgment of $635,-000 for salvage services rendered by plaintiff Wijsmuller to defendant United States must be affirmed.

---

**5.** With exceptions not here relevant, the Federal Rules of Civil Procedure apply to suits in admiralty.  *In re Northern Transatlantic Carriers Corp.,* 423 F.2d 139, 140 (1st Cir.1970); *Craig v. United States,* 413 F.2d 854, 856 n. 2 (9th Cir.1969);  *see* Fed.R.Civ.P. 81(a)(1).