REYNOLDS LEASING CORP., and Sea-Land Services, Inc., Plaintiffs,

v.

The TUG PATRICE McALLISTER, her engines, boilers, apparel, etc., and McAllister Brothers, Inc., Defendants.

No. 82 Civ. 4214 (HFW).

United States District Court,
S.D. New York.

Sept. 30, 1983.

Poles, Tublin, Patestides & Stratakis by Melvin J. Tublin, Thomas J.R. Stadnik, New York City, for plaintiffs.

Healy & Baillie, William F. Losquadro by John R. Geraghty, John P. James, New York City, for defendants.

## MEMORANDUM DECISION

WERKER, District Judge.

Plaintiffs Reynolds Leasing Corporation (Reynolds), the owner of the containership S.S. SEALAND VENTURE (the VENTURE), and Sea-land Services, Inc. (Sea-Land), the bareboat charterer of the VENTURE, commenced this action against McAllister Brothers, Inc., owner of the tugboat PATRICE McALLISTER (the PATRICE), seeking an award for salvage services. The case was tried before the court without a jury on July 5 and 6 1983. The court's findings of fact and conclusions of law follow. The parties have agreed upon many of the facts.

### I.

The VENTURE, an SL 18 type vessel, has a gross weight of 24773 tons, is 219.77 meters in length and was insured by her owners in 1980 for $20,700,000. The PATRICE is a twin-screw tugboat of 190 gross tons, is 37.50 meters in length and was insured by her owners in 1980 for $1,260,000.

While visiting Jacksonville, Florida on February 27 and 28, 1980, prior to her scheduled ocean crossing, the VENTURE was found to have her rudder dropping slightly on its post. In light of this condition, the vessel's operators decided to effect repairs prior to the vessel's intended transatlantic crossing. The nearest available dry dock capable of handling the VENTURE was the Bethlehem Steel Corporation's dry docking facility in Bayonne, New Jersey. The American Bureau of Shipping, the VENTURE's classification society, and the United States Coast Guard required the VENTURE to have a tug escort to Bayonne.

The tug escort was arranged in two shifts. The VENTURE departed Jacksonville at 1910 hours on February 28, 1980, and made her rendezvous with the tug ANN MORAN at the Jacksonville sea buoy at 0212 hours on February 29, 1980. The VENTURE and the Tug ANN MORAN began their transit north at 0230 hours on February 29, 1980. McAllister Brothers dispatched the tug PATRICE at or about 1900 hours on February 29, 1980 from New York harbor to proceed down the coast to meet the VENTURE. The PATRICE met the VENTURE and the tug ANN MORAN at 1115 hours on March 2, 1980 near Cape Hatteras. At this point, the ANN MORAN was relieved and returned to Jacksonville, and the VENTURE and the PATRICE began proceeding to Bayonne. The VENTURE had to operate at reduced speed so that the tugboat, capable of a maximum speed of twelve knots in calm weather, could keep pace with the VENTURE, which is capable of 24 knots in calm seas.

The VENTURE and the PATRICE encountered terrifying storm conditions shortly after their rendezvous. At 1200 hours on March 2, 1980, the weather was recorded on the VENTURE as overcast skies, very rough seas with deep swells. In this weather, the VENTURE was pitching and rolling easily. At 1600 hours on March 2, the weather conditions were recorded on the

VENTURE as north-northeasterly winds at Beaufort Force 10 with heavy seas and swells. At or about 1630 hours, the PATRICE suffered a fire in the panel box in her wheelhouse. At 1650 hours, the VENTURE reduced her speed in order for the PATRICE to lower her speed. At 1652 hours on March 2, 1980, the PATRICE notified the VENTURE that heavy seas made headway impossible and asked the VENTURE to provide a lee. In response to this request, the VENTURE hove to and turned to port in order to provide a lee. It is agreed that both vessels moved slowly toward Cape Henry with the PATRICE in the lee of the VENTURE, until the vessels hove to at 2400 hours.

Between 1652 and 1845 hours on March 2, 1980, the PATRICE informed the VENTURE that she was taking on water and was unable to control the water in her bilge as only one of three bilge pumps was working, and that the master on duty was having difficulty steering due to a jammed port rudder. The rudder malfunction resulted in the PATRICE making sudden 90° turns to the left on occasion. At or about 1700 hours on March 2, the chief mate of the VENTURE rigged life-saving equipment in case it became necessary to rescue the crew of the PATRICE. At or about 1845 hours, the PATRICE informed the VENTURE that she was in an emergency condition, could not continue the voyage and requested the VENTURE to assist her to port.

At 1845 hours on March 2, the VENTURE began a diversion to assist the PATRICE into Cape Henry, Virginia, the nearest port of refuge. The VENTURE, pursuant to this request, changed her course, which was heading directly into the storm, to a course heading for Cape Henry. The new course placed the full force of the storm on the starboard side of the VENTURE.

Keeping the PATRICE in the lee and the diversionary course required the VENTURE to use more rudder action to maintain her course against the force of the winds and seas. Maintaining the lee also presented the risk that the VENTURE could sustain further rudder damage. At or about 1855 hours on March 2, a distress call was made by the VENTURE to the United States Coast Guard to ask if the Coast Guard could help the PATRICE.

Between 1700 hours on March 2 and for the duration of the night spanning March 2 and 3, the Master of the VENTURE had a crew standing by with life saving equipment ready to be ejected into the sea if the PATRICE went over. At or about 2100 hours on March 2, the PATRICE lost use of her gyro compass. At or about 2200 hours, the PATRICE lost use of her radar. One of the PATRICE's calling radios and the single side band radio were reported as not working beginning sometime after 1600 hours on March 2, 1980 and 1215 hours on March 3, 1980.

The storm encountered by the VENTURE and the PATRICE was reported to have been one of the worst storms in the area in over one hundred years. The Governor of Virginia imposed marshall law due to the storm.

Between 2400 hours on March 2, 1980 and 0410 hours on March 3, 1980, the vessels hove to due to the severity of the storm with the VENTURE continuing to stand by. At 2400 hours on March 2, 1980, the weather conditions consisted of a violent storm with northerly winds of Beaufort force 10–11, deep confused seas and swells, and heavy snow flurries. At or about 0830 hours on March 3, 1980, the vessels passed Cape Henry and entered Chesapeake Bay. At or about 0949 hours on March 3, 1980, the VENTURE anchored at Lynnhaven Naval Anchorage and the tug JANE McALLISTER commenced to escort the PATRICE to the McAllister dock at Norfolk, Virginia. At no time during the period from 1115 hours on March 2 to 0949 hours on March 3 did the vessels come into physical contact with each other.

Prior to the VENTURE's arrival at Lynnhaven Naval Anchorage, Sea-Land and the Master of the VENTURE, Captain Nicolson, decided to arrange for a diver to inspect the VENTURE's rudder to check if any further damage had been sustained.

At Lynnhaven, a diver's inspection was unsafe because of continuing poor weather conditions. At 1746 hours on March 3, the VENTURE weighed anchor and proceeded to the Sea-Land dock in Portsmouth, Virginia for a diver's inspection of the rudder. At 2200 hours on March 3, the VENTURE was secured to the Portsmouth dock. The inspection revealed no further deterioration to the rudder. At 0630 hours on March 4, 1980, the VENTURE, escorted by tug, departed Cape Henry and headed for Bayonne.

Plaintiffs claim salvage services to the defendant at its request during the period from 1652 hours on March 2, 1980 until 0949 on March 3, 1980 and occasional additional loss of time and expense as a result of salvage service to examine the rudder on the VENTURE until 0630 hours on March 4, 1980. The defendant contends that the VENTURE created a lee for the PATRICE from approximately 1652 hours to 2341 hours on March 2, 1980. McAllister Brothers state that "admittedly such action contributed in some way—albeit minor—to the PATRICE's success in resolving several of the difficulties she was experiencing." Defendant's pretrial Memorandum at 3. It is argued that "after 2341 on March 2 . . . the aid rendered to the PATRICE by the VENTURE was negligible." *Id.*

## II.

■ Salvage is the " 'service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended.' " *B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 338 (2d Cir.1983) (quoting *McConnochie v. Kerr,* 9 F. 50, 53 (S.D.N.Y.1881), *modified sub nom. McConnochin v. Kerr,* 15 F. 545 (C.C.S.D.N.Y.1883)). The act of salvage need not be dramatic and need not consist in rendering physical assistance. "[S]tanding by or escorting a distressed ship in a position to give aid, if it becomes necessary," . . . qualifies as a salvage act. G. Gilmore & C. Black, *The Law of Admiralty,* § 8–2 at 537 (2d ed. 1975). *See also*

*The Pendragon Castle,* 5 F.2d 56, 57 (2d Cir.1924). For the court to find that a salvage service was rendered, three elements must be present: marine peril; service voluntarily rendered, not due to any pre-existing legal or official duty; and success in whole or in part, with the services performed having contributed to such success. *B.V. Bureau Wijsmuller v. United States,* 702 F.2d at 338.

■ "Peril necessary to give rise to a claim for salvage must be present and impending, although it need not be *immediate* or absolute." *Id.* In view of the severity of the storm encountered by the VENTURE and the PATRICE on March 2–3, 1980, marine peril clearly was present and its existence is admitted by the defendant. Defendant's pretrial Memorandum at 2.

The assistance provided by the VENTURE was voluntary. There was no duty on the part of the VENTURE to help the tug. The contention urged by McAllister Brothers that the VENTURE was under a pre-existing duty to stand by the PATRICE and that her failure to do so would have constituted a breach of her legal obligation to maintain a tug escort is without merit. This is an unusual case since the large container ship rendered assistance to her tug escort. However, the service rendered was voluntary.

The final element is success in whole or in part with the service performed by the salvor having contributed to the ultimate success. *B.V. Bureau Wijsmuller v. United States,* 702 F.2d at 339; *The Blackwall,* 77 U.S. (10 Wall) 1, 12, 19 L.Ed. 870 (1870). The VENTURE performed a successful salvage service during the period from 1652 hours on March 2, 1980 through 0949 hours on March 3, 1980. The VENTURE provided a lee of such magnitude that it negated many of the difficulties which may have been experienced because of the inability of the PATRICE to steer. She provided communication facilities and a rescue potential as well as navigational assistance. The lee provided a haven where the PATRICE might seek refuge. The purpose of providing a lee by a larger ship to a tug is for the

larger vessel to take the shock of the wind, sea and swell on its windward side keeping the protected smaller vessel on its opposite side, where the larger vessel's hull has caused the wind and swell to be lessened and calmer. As noted by Captain Patterson, an expert witness called by plaintiffs, "there is no such thing as making a lee that will be a flat calm in a gale of sea" (Trial Transcript at 39).

The position of the PATRICE varied from time to time. The tug's position ranged from approximately 50 feet to a distance of one-half to three quarters of a mile or a mile from the VENTURE when the PATRICE was making her out of control turns to get back in the lee. As Captain Nicolson testified, the most favorable position for the tug was 50 to 100 feet from the side of the VENTURE (Trial Transcript at 55). The PATRICE had great difficulty maintaining that position. However, the court finds that during the period from 1652 hours on March 2 through 0949 hours on March 3, she was able to maintain the most desirable position at least three quarters of the time. The VENTURE, with a length of over 700 feet, provided a considerable shelter until 0949 hours on March 3, 1980 when the vessels anchored at Lynnhaven. The lee of the VENTURE substantially reduced the sea and swell. When the tug was in the lee, seas of 50 feet high were cut down to 20 feet. There was an area of relatively smooth water alongside the VENTURE out to a distance of about 100 feet.

### III.

█ The *Blackwall* factors are those considered by a court in fixing a salvage award. 77 U.S. (10 Wall) at 13–14. They are to be considered in descending order of importance and are as follows: (1) degree of danger from which the property was rescued; (2) value of the property saved; (3) risk incurred by the salvor in saving the property from the impending peril; (4) promptitude and skill displayed by the salvor in rendering the service; (5) value of the property employed by the salvors and the danger to which it was exposed; and (6)

labor expended in performing the salvage act. The equitable method of reaching a just award is to look at all of the *Blackwall* factors. *B.V. Bureau Wijsmuller v. United States,* 702 F.2d at 339–340.

The PATRICE, faced with serious steering problems, was in a high degree of peril due to storm. She was assisted by the VENTURE's provision of a lee, escorting and standing by, and provision of navigation. The PATRICE was in imminent danger throughout the entire period.

The tug had a market value of $1,500,000 in 1980.

█ The risk to which the salvors are exposed should be examined in view of the hazards which are typically faced by men who go to sea. "'It is risks out of the ordinary for men of that calling, which are recognized and liberally awarded in salvage cases.'" *Id.* at 340. (quoting 3A M. Norris, *Benedict on Admiralty,* § 264 at 21–15 (6th ed. 1980)). Here, in providing a lee the VENTURE ran the risk of losing her own steerage and being at the mercy of the storm. The VENTURE exposed herself to storm damage for the protection of the PATRICE.

In providing a lee, the VENTURE exposed herself to sea and swell on the quarter. This required maximum rudder movement to maintain her course and exposed her to rolling and up and down motions. If the VENTURE had not provided a lee, she could have proceeded to her destination, or if she were to ride out the storm, she could have heaved to so as to take the seas and wind on her bow and thus lessen her use of rudder.

Rather than go into Chesapeake, Captain Nicolson would have preferred to have continued in the direction he was going. Chesapeake entrance was a far greater hazard to the VENTURE than continuing to Bayonne without a tug. Captain Nicolson would not have entered Chesapeake solely to have the rudder inspected because the hazard in entering Chesapeake entrance at that time was greater than continuing with a rudder malfunction.

The promptitude and skill displayed by the salvor were considerable. The VENTURE responded to the needs of the PATRICE by immediately providing a lee and navigation and communication assistance. The crew of the VENTURE took precautionary measures to provide for the availability of life saving and rescue equipment.

With respect to the value of the salving property, the VENTURE had an insured value in 1980 of $20,700,000. She was exposed to the danger of losing her rudder, and being adrift in a storm of Beaufort Scale force 10.

 The operating expenses and disbursements incurred by the VENTURE for the period from 1652 hours on March 2, 1980 to 0630 on March 4, 1980 (1.568 days) amounted to $38,055.31. These expenses were necessarily incurred by the VENTURE as a result of the salvage service rendered and as a result of the diver's inspection of the rudder. *See* Pretrial Order at 10–11, # # 2–17. The evidence demonstrates that the expenses are reasonable and are properly recoverable. Such expenses are generally stated as an item of recovery in addition to the salvage award, since they are for the benefit of the owner. G. Gilmore & C. Black, *The Law of Admiralty*, § 8–9 at 562–63 (2d ed. 1975).

Considering all of the *Blackwall* factors, the court fixes a salvage award for the period of the salvage service from 1652 hours on March 2, 1980 to 0949 hours on March 3, 1980, in the amount of $75,000. The court believes that this award is just under the circumstances of the case. The salvage service rendered by the VENTURE significantly contributed to the success of the PATRICE in safely reaching port. The nominal award urged by McAllister Brothers is inappropriate. The award of $38,-055.31 for operating expenses and disbursements incurred by the VENTURE is in addition to the salvage award.

Plaintiffs' claim for lost earnings due to the 1.568 day delay is denied for failure of proof. Plaintiffs failed to include net revenue for the voyage in question.

Here, the VENTURE *did* not lose any voyages and the net revenue figures for voyage 118, which was the casualty voyage, are omitted from the calculations of revenue submitted by plaintiffs. The fixed administrative expense of 6.4% of revenue was not included in the calculations. Voyages 119 and 120 were not typical voyages because the VENTURE missed certain ports. Voyage 120 missed Bremerhaven and 119 was very short—only 11 days. Using voyages 116, 117, 121 and 122, plaintiffs arrived at an average revenue (minus expenses) of $73,869.86 per day. However, this figure is reduced to an average revenue of $68,214.42 per day when the three complete voyages (115, 116, 117) prior to voyage 118 and the three complete voyages (121, 122, 123) subsequent to 118 are taken into account. The revenue and expense calculations submitted by plaintiffs in support of their claim for lost earnings are incomplete and do not establish a true average. The testimony of Messrs. Gorney and Dennen on the issue of the loss of earnings of the VENTURE was confusing and provided insufficient information for the court to make a finding.

In accordance with the above, damages in the amount of $113,055.31 are awarded to the plaintiffs for the VENTURE's salvage service to the PATRICE. Plaintiffs are directed to submit a judgment on notice within ten days after entry of this decision.

SO ORDERED.